1 HANSON BRIDGETT LLP
SANDRA L. RAPPAPORT, SBN 172990
2 srappaport@hansonbridgett.com
MOLLY A. LEE, SBN 232477
3 mlee@hansonbridgett.com
425 Market Street, 26th Floor
4 San Francisco, California 94105
Telephone:    (415) 777-3200
5 Facsimile:    (415) 541-9366

6 Attorneys for Petitioner
UPS, INC.
7
WEINBERG, ROGER & ROSENFELD
8 DAVID A. ROSENFELD, SBN 58163
A Professional Corporation
9 1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
10 Telephone:    (510) 337-1001
Facsimile:    (510) 337-1023
11
Attorneys for Respondent
12 Teamsters, Local 2785

13

14                    **UNITED STATES DISTRICT COURT**

15         **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

16

17 UPS, INC.,                           | Case No. 4:11-cv-01820-DMR

18              Petitioner,             | **STIPULATION AND [PROPOSED]**
                                        | **ORDER CONFIRMING ARBITRATION**
19        v.                            | **AWARD**

20 TEAMSTERS, LOCAL 2785,

21              Respondent.

22

23         Petitioner UPS, INC. ("Petitioner") and Respondent TEAMSTERS, LOCAL 2785

24 ("Respondent") (collectively the "Parties") by their attorneys of record, hereby stipulate to

25 an order confirming the arbitration award of Arbitrator William E. Engler, issued on

26 September 7, 2010.

27         WHEREAS, on April 18, 2011, Petitioner initiated this case by filing a Petition to

28 Confirm Arbitration Award (the "Petition").

3116216.1

STIPULATION AND [PROPOSED] ORDER CONFIRMING AWARD
(Case No. 4:1 1-cv-01820-DMR)

1      WHEREAS, on May 6, 2011, Respondent filed an Answer to Petition to Confirm

2  Arbitration Award;

3      WHEREAS, the Parties stipulate that an Order may issue confirming the Award,

4  with each of the Parties bearing its own fees and costs.

5

6  **IT IS SO STIPULATED:**

7

8  DATED:  July 21, 2011                    HANSON BRIDGETT LLP

9

10                                 By:_____/s/ Molly A. Lee_____

11                                     SANDRA L. RAPPAPORT
                                       MOLLY A. LEE
12                                     Attorneys for Petitioner
                                       UPS, Inc.
13

14

15  DATED:  July 21, 2011                    WEINBERG, ROGER & ROSENFELD, PC

16

17                                 By:_____/s/ David A. Rosenfeld_____

18                                     DAVID A. ROSENFELD
                                       Attorneys for Respondent
19                                     Teamsters, Local 2785

20

21

22                          **[~~PROPOSED~~] ORDER**

23      Pursuant to the above stipulation between the Parties, and good cause appearing,

24  IT IS SO ORDERED that:

25      1.      Petitioner UPS, Inc.'s Petition to Confirm Arbitration Award is hereby

26  GRANTED, and the arbitration award, dated September 7, 2010, by arbitrator William E.

27  Engler, a copy of which is attached hereto as Exhibit A and incorporated herein, is hereby

28  confirmed in all respects.

3116216.1
STIPULATION AND [~~PROPOSED~~] ORDER CONFIRMING AWARD
(Case No. 4:1 1-cv-01820-DMR)

1     2.     JUDGMENT shall issue consistent with this Order.

2

3  Dated: July __22____, 2011

4

5                                              _____

                                               THE HONORABLE DONNA M. RYU
6                                              United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3116216.1

STIPULATION AND [PROPOSED] ORDER CONFIRMING AWARD
(Case No. 4:1 1-cv-01820-DMR)

# EXHIBIT A

A MATTER OF ARBITRATION

| UNITED PARCEL SERVICE | ) | GRIEVANCE:  Vacation Scheduling |
|---|---|---|
| | ) | |
| Employer | ) | |
| | ) | HEARING:  May 21, 2010 |
| TEAMSTERS LOCAL 2785 | ) | |
| | ) | Decision: September 7, 2010 |
| Union | ) | |

DECISION

WILLIAM E. ENGLER, ARBITRATOR

APPEARANCES BY:

On behalf of the Employer:

    Daniel J. Clinton, Esq.
    Hanson Bridgett
    425 Market Street, 26th Floor
    San Francisco, CA  94105

On behalf of the Union:

    Antonio Ruiz, Esq.
    Weinberg, Roger & Rosenfeld
    1001 Marina Village Parkway
    Alameda, CA  94501-1091



## STATEMENT OF PROCEDURE:

This matter arises out of the application and interpretation of a Collective Bargaining Agreement, which exists between the above named Union and Employer. [1]Unable to resolve the dispute between them the parties selected this Arbitrator in accordance with terms of the contract to resolve this matter.  A hearing was held in San Francisco, CA on May 21, 2010.  During the course of the proceedings, the parties had an opportunity to present evidence to exam and cross-examine witnesses.  At the conclusion of the hearing the parties submitted timely briefs on July 14, 2010.

## ISSUE:

Did the Employer violate the Collective Bargaining Agreement by requiring employees to select and schedule vacations for their accrued vacation weeks on a calendar year basis rather than on an anniversary year basis. If so what is the appropriate remedy?

It is noted that the Grievance was originally filed on behalf of Teamsters Local 278 and since that time the Local has changed its number designation; and it's now Local 2785 and the decision should reflect that:

## RELEVANT CONTRACT LANGUAGE

## NORTHERN CALIFORNIA SUPPLEMENTAL AGREEMENT
## ARTICLE 25 – VACATIONS

## SECTION 1:

Employees with one (1) year of service and less than three (3) years of service with the Employer shall receive two (2) weeks (10 working days) of vacation with pay

---

[1]Joint Exhibit Number 1, California Supplemental Agreement and Northern California SORT Rider and National Master UPS Agreement. December 2007 thru July 31, 2013

2

each year.  Employees with three (3) years of service shall receive three (3) weeks (15 working days) of vacation with pay each year.  Any employee who has ten (10) years of service or more, regardless of his/her anniversary date, shall receive four (4) weeks (20 working days) of vacation with pay each year.  Any employee who has twenty (20) years of service or more shall receive five (5) weeks. (25 working days) vacation with pay each year.  Any employee who has twenty five (25) years of service or more shall receive six (6) weeks (30 working days) vacation with pay each year.  Any employee who has thirty (30) years of service or more shall receive seven (7) weeks (35 working days) vacation with pay each year.

Any employee laid off before the completion of one (1) year or during the first three (3) years of employment shall receive prorated vacation due on the basis of .833 of a day for each month of employment.

After three (3) years of employment and up to ten (10) years of employment prorated vacation shall be granted on the basis of one and one quarter (1 ¼) days for each month of employment.

After ten (10) years of employment, prorated vacation shall be granted on the basis of one and two thirds (1 2/3) days for each month of employment.

After twenty (20) years of employment, prorated vacations shall be granted on the basis of two days and two thirds (2/3) of one (1) hour for each month of employment.

After twenty-five (25) years of employment, prorated vacations shall be granted on the basis of two and one half (2 ½) days for each month of employment.

After thirty (30) years of employment prorated vacations shall be granted on the basis of 2.91667 days for each month of employment.

Any employee who reports to work and is put to work thirteen (13) days in a calendar month shall be entitled to vacation credit for that month.  Paid holidays, paid vacation, paid sick, paid jury duty and paid funeral leave shall be continued as days worked for the purpose of this Section.

Seniority is to be considered in the choice of vacation periods.  In arranging vacations, due consideration shall be given to the Employer so that his business will not crippled or seriously affected by reason of too many employees seeking vacation at the same time.

**SECTION 2**

3

All accrued vacation pay for the amount of vacation time to be taken is to be paid to the employee one (1) day before the employee's last shift worked by separate check. No employee shall be shorted his/her vacation pay for all vacations properly selected during the annual March selection. If there is a dispute regarding vacation pay, the Company will issue the disputed pay until time that the Company provides proof of all other vacation payments for that current year.  If the records prove that the employee has been overpaid the vacation pay, the Company may deduct this overpayment by deducting an equal amount of vacation from next year's account.

It is agreed that for each week of paid vacation, the employee shall receive an additional five (5) hours pay at the straight time hourly rate.

**SECTION 3**

Vacation periods are not to be arbitrarily assigned to employees during the months of November through March unless mutually agreed upon.  Based on seniority, vacation periods will be assigned at the employee's choice during the months of April through October.
It is the understanding of the parties that from January 1st through the first three weeks of November, employees shall be allowed to select vacation at 100% of the normal vacation selection ratio.  During the Thanksgiving week, that number shall be reduced to 75%.

The total amount of accrued vacation weeks for the period of April 1st to October 31st will be subtracted by employees taking vacations from January 1st to March 31st and that figure divided by thirty (30) weeks will be the number of employees allowed to take vacations in the same week for the balance of the vacation period. Any fraction of a whole number shall be rounded up to the next highest number.
Whenever possible and when desired by employees, they may stagger or spread their vacation period throughout the year.  However, in no case shall any portion of vacation be less than one (1) week.

**SECTION 4**

It is agreed by both parties to this Agreement that employees must take their accrued vacation each year and that no arrangement to work for additional compensation during their earned vacation will be allowed except where mutually agreed upon by the Employer and the Union.

**SECTION 5**

The Employer and an employee may agree on a change in the vacation period of such employee after the vacation period of such employee after the vacation

4

schedule has been posted, provided it does not affect the vacation period of any other employees on the vacation schedule.

**SECTION 6**

Any employee called into the service shall be paid for prorated vacation earned.

**SECTION 7:**

The vacation list shall be posted not later than March 1st of each year.  For choice of vacations, once a vacation selection list is posted, one (1) week is allowed for the first twenty-five percent (25%) on the seniority list to select, then one (1) week will be allowed for the second twenty-five (25%) to select then one (1) week shall be allowed for the third twenty-five (25%) to select, then one (1) week shall be allowed for the fourth and final twenty-five percent (25%) on the seniority list to select. Those not signing up in the correct week shall lose their choice of vacation and must take what is left.

Vacation selection shall occur during March.

Once completed the vacation schedule shall be posted on the bulletin board.

**SECTION 8**

If a paid holiday falls within an employee's vacation, said employee will be granted an additional optional holiday to be take in accordance with Article 24 of this agreement or be paid eight (8) hours of straight time pay for the holiday.

## RELEVANT CONTRACT LANGUAGE

## NORTHERN CALIFORNIA SUPPLEMENTAL AGREEMENT
## ARTICLE 17

**SECTION 1 – PRIORITY OF AGREEMENT**

The Employer agrees not to enter into any agreement or contract with employees, individually or collectively, which in any way conflicts the terms and provisions of this Agreement.  Any such agreement shall be null and void.

## NATIONAL MASTER UNITED PARCEL SERVICE AGREEMENT
## ARTICLE 2 – SCOPE OF THE AGREEMENT

**SECTION 1 – SINGLE BARGAINING UNIT**

5

All employees covered by this Master Agreement and the various Supplements, Riders and Addenda thereto, shall constitute one (1) bargaining unit. The printing of this Master Agreement and the aforesaid Supplements, Riders and/or Addenda in separate agreements is for convenience only and is not intended to create separate bargaining units.

## SECTION 2 – RIDERS

Present Supplements. Riders and Addenda shall remain in effect. Any new Supplement, Rider or Addendum, or changes to Supplements, Riders or Addendum, or in the contracts affiliation of any Local union covered by this Agreement must be submitted to the Joint National Negotiating Committee for review and approval. Failure to be approved by the Committee shall render said Supplement, Rider or Addendum null and void.

Any lesser conditions contained in any Supplement, Rider or Addendum shall be superseded by the conditions contained in this Master Agreement. However, except where specifically stated otherwise in the Master Agreement, nothing in this Master Agreement shall deprive any employee of any superior benefit contained in their Supplement, Rider or Addendum.

## THE NORTHERN CALIFORNIA SORT RIDER TO THE NORTHERN CALIFORNIA SUPPLEMENTAL AGREEMENT

The language of Article 22 Vacations under the SORT RIDER is identical to the language contained in Article 25 Vacations of the Northern California Supplemental Agreement.

## FACTS:

This dispute involves the language of Article 25- VACATIONS Section 4, on page 49 of the Northern California Supplemental Agreement, 2007 thru 2013. Based on the Employers interpretation of this Section the Employer has required that employees must take their accrued vacation each year by the end of the calendar year. The Union argues that the provision "each year" should be read to mean that an employee's accrued vacation must be taken on an anniversary year basis beginning on the date of hire. Grievance was

6

initially filed by only Local 278 among the nineteen (19) Unions bound by the Collective Bargaining Agreement.

Under the Employers interpretation all accrued leave must be taken by the end of the calendar year.   Mr. Booker, the former Secretary/Treasurer of Local 278 and the present Secretary/Treasurer of the combined Local 2785, was the chairman of the Northern California Teamsters Negotiating Committee from 1979 thru 2007.   As the Secretary/Treasurer of Local 2785, he filed with the Northern California Grievance file Case Number. UPR12-09-14ZZ on October 29, 2009.   A copy of the NorCal Grievance Panel Decision Form for this matter is dated January 4, 2010 and is marked as Attachment 1 to this decision.

The Union position has always been that there is no such thing as "carry over vacations" because if you earn it on an anniversary year then you have – I guess the easiest way to put it is, "It takes a year to earn it, you have a year to spend it. So you work a year, now you have a year to spend it. That's how it works."

Bookter advised, "Theoretically what scares the Company, in my opinion and through discussions with the Company, is that you can back to back vacation under this contract, i.e., if you work a year, you have an entire year.  If you are hired on June 1st you work one year, June 1st you have two (2) weeks of vacation coming.  If you choose not to take that until the last two (2) weeks of May of the following year, you now have those two (2) weeks plus you have two (2) weeks on June 1st, so you would have four (4) weeks available at the March vacation pick." "And, so what scares them is that if everybody did that, then instead of having three hundred (300) weeks of vacation for instances, such as a

7

feeder, they would have 600 weeks divided by 30, which would mean that you would have 50 people off every week or whatever, whenever it comes out, 30 divided by it – it would be twenty-some people."

At that point, Union Exhibit 1 thru 10 The Notices passed out to employees from 1999 thru 2006 were placed in the record. Secretary Bookter explained how he passed out the various notices in the plants and they were quickly removed from the plants.  Mr. Bookter advised that these notices concerning the Company's vacation policies were handed out through stewards to employees.  Booker advised, "I printed this up so I could hand it out to Members because they were being told again that they couldn't have *carry over vacations*. Bookter admitted that these notices were never presented to the Company as a Grievance.

Booker recalled that Harry Polland, Labor Economist for the firm that represented Teamsters in the 1960s, in about 1960 commenced negotiations on the vacation policy with respect to negotiations of the term "year" in Section 4.  Booker  believed that Section 4 has not changed that much.

Bookter advised that in terms of whether employees in other jurisdictions who were part of the Northern California Supplemental Agreement were being required to schedule vacation on a calendar year basis rather than on an anniversary year basis, Booker had no understanding of what was happening in those other jurisdiction.

Bookter recalled, "His various notices on vacation dating back to 1999(Union Exhibits 1 through 10 showed that he had issues with the Company on that point.

**Interchange between Employer Attorney Clinton questioning Mr. Bookter:**

Q.     "Did you come to understand that other Local's, other than your Local, had issues with UPS about the issue of a calendar year vs. an anniversary year?

A.     No I don't think that per se. No. I think the issues were some of the limitations in the number of people off per week.  There was a lot of discussion in 1997 (Negotiations) over the formula, That is. The formula used to be twenty-six (26) weeks, then thirty (30) weeks, in other words the thirty (30) is not related to the actual vacation period.

Q.     Okay?

A.     Where the twenty-six (26) weeks, years ago, was related to what the prime vacation period was, I believe April thru, I believe, October or thru September."

Booker was then given a copy of Employer Exhibit 1 which reflects the changes in negotiations with respect to Article 25 Vacation Languages Change from 1993 to 1997. What it shows is that the Agreement in 1997 it used to be the formula used to involve a division of twenty-six (26) weeks and to the accrued week number.  That got changed to thirty weeks in 2002.

**Interchange between Clinton and Booker:**

A.     Now I thought you said the twenty-six (26) weeks related to the vacation period?

Q.     I thought you said the thirty (30) weeks didn't relate to the vacation period?

A.     Right, it's not, that was our discussions

Q.     The vacation period got extended another month from the September 30 thru October?

A.      Well, No.  Because if you look at the letter it's January thru November.  The only month that is restricted of vacation now is December.  Ok.  So, the thirty (30) becomes irrelevant, we are not talking about the number thirty (30) it was only used as a formula.

Q.      Jack look at the contract.

A.      For the prime period?

Q.      Look at page 48 of the contract. "The thirty (30) weeks is the number you divide into the period from April 1 to October 31 isn't it? That what it says?

A.      I understand what it says that's how you determine the number of people off.  That's the only thing it is for; the number of people off per week.  There is also a grievance decision on this.

Q.      Jack are you saying that the change from twenty-six (26) weeks to thirty-six (36) weeks wasn't a change to match the period from April to October?

A.      Exactly." Booker corrects that it's thirty (30) weeks.

Q.      You are saying that the twenty-six (26) weeks did relate to this period that's set forth in the 1993 language?

A.      It related to

Q.      That is what you said?

A.      It's related to the prime vacation period of April thru September, now 'prime' means everyone wants those vacation weeks.  There were still vacations in October, Ok, which were not part of that formula, ok, people still took vacations in January, February, and March. What the Company wanted, they wanted a forty-eight (48) prime vacation period.  Ok. So, it should be divided by forty-eight (48)

Q.      When they proposed a forty-eight (48) week vacation period, they did it in conjunction with a proposal to extend the vacation selection period from January thru November, didn't they

A.      For the formula, you understand that; let me explain how this formula works.
        They made a proposal for forty-eight (48) weeks not reflected to the vacation period, but for the formula. They wanted to change the formula to limit the number of

people off per week. That's what the whole issue was about. Because if you restrict this to twenty-six (26) weeks and you got three hundred (300) weeks of vacation that obviously pumps up the number of people off each week. And that's what the operators were complaining about.

Now prior to having a peak-season, they hired all those people during the summer and now you went into peak-season with trained people. Well, after you go a free period they didn't want to hire people during the summer because you got all of that free basically free period where you can hire people at a lower rate and work them the three (3) months and then gain seniority. That is what we were trying to limit.

Q.     Let me just get it clear. You are telling me that at the negotiations in 1997 that the proposal to go the decision to go to thirty (30) weeks wasn't in relationship to this April to October period?

A.     Was not.

Bookter advised that the decision of the Company to go to 30 weeks wasn't in

relationship to the April to October period.

**Interchange between Clinton and Bookter:**

Q.     So you have known over the years that UPS has a different interpretation of the contract that you do; that's true, isn't it:

A.     I'm aware that some people were instructing people that they had to take all their vacation by the end of the year. I'm not saying that the Company agreed with that policy, because when it was pushed for those individuals, it got straightened out. If somebody didn't complain, it didn't get straightened out.

Q.     Are you telling me that the labor relations manager never expressed to you that UPS had a different position than you did on this subject?

A.     Listen, when we negotiated the contract, Ed Lyhart was the spokesman for the Company. Okay, in 1997 we went through this issue on vacation over and over again because the operators wanted 48 weeks of vacation.

11

There was then a mention of two letters that were not put into evidence.

**Interchange between Clinton and Bookter:**

Q.   Are you telling that Mr. Lyhart during the 1997 negotiations, agreed that it was an anniversary year, not a calendar year?

A.   It wasn't specifically discussed.   No. Nobody has taken that position until now, to where people started telling people you had to take it by the end of the year.   That's only been the last couple of years.   People have been carrying over vacations for – I started there in 1967, I did.

Q.   So it Would be true, would it not, that as the Chairman of the Nor Cal negotiating committee, you never proposed language in Section 4 to make it clear that it was an anniversary year rather than a calendar year?

A.   No.  If you want to know what I think Section 4 means it's clear in my mind it means to stop people from selling their vacation.   That's the sole purpose of that language.

Q.   Did you as the chairman of the negotiating committee, at any time, seek to clarify that language to make it clear that when it referred to "vacation each year" it was referring to an anniversary year rather than a calendar year?

A.   It was never a problem in negotiations.

Q.   Well, maybe not for your local.   But when you were the chairman of all the locals, did you ever do that?

A.   Nobody.  Everybody complained, no.

<u>**Employer's statement of position**</u>

The end of section one of Article 25 states:   "seniority is to be considered in the choice of vacation periods.   In arranging vacations, due consideration shall be given to the Employer so that its business will not be crippled or seriously affected by reason of too many employees seeking vacation at the same time."   The Company and the Union came up with a formula and this formula has been around for 20 or 30 years.   What the Employer

12

needed as part of these negotiations was some ability to plan especially during what they call the prime vacation months, months that most want.

Article 25, Section 3, the second sentence, states: "Based on seniority, vacation periods will be assigned at the employee's choice during the months of April through October."

The fourth paragraph of Section 3 sets forth a formula that establishes the number of employees allowed to take vacations in the same week for the balance of the vacation period. The formula states: "The total amount of accrued vacations weeks for the period of April 1 through October 31 will be subtracted by employees taking vacations from January 1 to March 31 and that figure divided by 30 weeks." It is evident that the number of weeks relates to the 30 weeks between April 1 and October 31. In the previous contract which is Employer Exhibit 1 the period in that paragraph was from April through September, a period of roughly 26 weeks. In the 1997 contract negotiations the parties negotiated a change to 30 weeks as another month, October, was added and it was no longer 26 weeks in the formula but then 30 weeks.

The formula in the 4th paragraph of Section 3, Article 25 is use, by the Employer to establish, the number of employees allowed to take vacations in the same week for the balance of the vacation period. The Company in the 2007 Negotiations and the Union at Panel agreed that any fraction of a whole number shall be rounded up to the next highest number in that paragraph that contains the formula.

Employer Exhibit 2 (attached to this decision) contains the 2010 vacation schedule for a preload operation. The document contains the name of the most senior employee in

the operation at the top, his eligibility date, the number of weeks of accrued vacation which he has which is three plus A. Against each employee's name is his or her accrued vacation weeks for the period of April 1 through October 31 for each employee. In the formula subtracted from that number of vacation weeks is the number of employees taking vacation weeks from January 1 through March 31 in 2010. That figure is divided by 30 weeks according to the formula in the contract and the resulting figure will be the number of employees allowed to take vacations in the same week for the balance of the vacation period. The employees, based upon their seniority, select their vacation dates on a form and their selections are placed on the vacation schedule. The Company then has to make up by that ratio enough employees off on the same week to let them fill up that schedule.

The Union argues that an employee's anniversary-date should be the date from when the employee can choose to take his or her vacation.

The employer argues that, if this were allowed, the formula becomes meaningless. This is because use of the anniversary date would allow vacations to be taken in the following year when an anniversary date would occur.

If the accrued vacation were to be taken on an anniversary year basis, then the negotiated formula which is to be implemented in February and March to establish the number of employees who could take accrued vacation each week for the rest of the year would not include those employees who chose to take their vacation on their hire or anniversary date which could occur in the following year.

Section 7 of Article 25 states that, "The vacation list shall be posted not later than March 1 of each year for the choice of vacations, once a vacation selection list is posted, one

week is allowed for the first 25% on the seniority list to select, then one week shall be allowed for the second, third and fourth in order to select. Those not signing up in the correct week shall lose their choice of vacation and must take what is left." That is, take what is left on the vacation schedule, which would be similar to a Vacation Schedule like Employer Exhibit 2. Those employees who fail to choose vacation times must take what is left, in the calendar year. Using the calendar year the parties have constructed a process by which employees are given the opportunity, by seniority, to sign up for the vacation period which they have accrued in the calendar year. If they do not use their accrued time they have to take what is left. They don't get to carry over their accrued vacation as the Union suggests, and be able to use it whenever they want down the road as long as it's before their next anniversary date.

What the Employer has done is comply with the contract by: 1) determining the accrued weeks that are available to be taken by the employees in the calendar year; 2) apply the formula set out in Section 3 of Article 25; 3) determine how many employees need to be off in the given week; 4) allow employees to select from the vacation period; 5) and if employees did not select, they were required to take what was left on the schedule for the balance of the calendar year.

The Employer contends that with 15,000 employees in the various operations covered by the contract, over time, employees have carried over their vacations from one year to the next, not on an anniversary-date basis but on a practical basis. If someone is on workers' comp leave, for example, and is unable to select or take vacations because they're out on leave, UPS does not require them to use their vacation leave. Also, you have

15

employees who just refuse to select or don't take vacation and UPS could assign those employees vacation.  But as a practical matter what they have tried to do is work out with the employee so they don't have a problem.  In some cases, that meant allowing people to carry over vacation into the following year even though they are not supposed to.  The Union contends that this is a right to an anniversary date.

## EMPLOYER'S TESTIMONY

Frank Cademarti, currently the Nor Cal labor manager, in 1980 went into the Industrial Engineering Department at UPS.  He became a supervisor and the industrial engineering manager of the feeder department in the East Bay district.  He was responsible for the operation of the vacation selection process and formula Which he testified functioned very similarly to what is being done today.  In those days everything was done manually and the payroll/or accounting would give the person responsible for the selection of vacations a list of what was on the books for the employees in that operation.  Back in the early 1980's it was the practice to require employees to schedule their vacation accruals in the calendar year.  The fact that employees had something called an anniversary year in order to select vacation was not brought, by the Unions, in the early to mid 1980's. Cademarti recalled that in 1989 he was the feeder manager in the North Bay.  He had no recollection that there were arguments, complaints or grievances made by Local 70 that scheduling employees on a calendar year basis was not in compliance with the contract.  In 1993 Cademarti recalled that he was the hub feeder division manager covering Sunnyvale and San Bruno hubs and all the district feeder drivers.  That included Teamsters Local 278

16

among other locals covered by the contract.  When he was hub and feeder manager, he recalled that employees in those operations were required to schedule their vacations in the same calendar year.  The employees were required to select their vacations during the calendar year, including Local 278 feeder drivers.

Cademarti recalled that in the 1997 negotiations, Article 25, Section 3 of the contract was modified.  There was an initial proposal by the Company to extend for all the year except November and December, actually all the way through Thanksgiving.  The 30 weeks was then a compromise in those negotiations which called for the extension into October and therefore 30 weeks would be the period in the formula that would be used.  That was the vacation period.  (If the Vacation period had gone for the entire year, 48 would have been the devisor used in the formula.  The agreement was reached using 30 weeks as the devisor number.)  The period from April to October 31 was negotiated to be the vacation period.  Prior to that negotiation, the vacation period ran until the end of September and there were 26 weeks.  When they added the month of October, there were four additional weeks coming out to 30 weeks.  The number of weeks that you come up with using that formula gives you the number of employees allowed to take vacation in the same period for the balance of the vacation period.  The formula gives you how many people we have to have trained and ready to go on roll.  So if the number is, whatever, 15, 12, ten, if you're in operation, you have to have that many spare employees during the vacation period.

**Stipulated Testimony of managers Fernandez and Echeveirria**

The Employer received a stipulation from the Union with respect to the testimony of Angel Fernandez, an employee now in the labor department at UPS and Matt Echeveirria,

17

currently the operations manager in the Sacramento Valley district and both testified as long-term employees from the late 1980's. It was stipulated by the Parties that their experience with respect to the vacation selection process for both employees was consistent with their years of experience at UPS, in that the employees were required to select vacation that they were eligible for in the calendar year and they were required to take the vacation in the calendar year that they were eligible. for in the vacation.

Richard D. Murphy, the presently retired but former Accounting Services Center controller, started with the Company in 1974 as a loader in the San Bruno hub as a member of Local 278.  He advised that once he was able to select vacation it was his understanding that he would take all the vacation weeks he had in the calendar year that he accrued them. Murphy became a part-time supervisor at the Sunnyvale hub and in that position with the hourly employees he facilitated the scheduling of vacations for the calendar years.  In 1978 he became a supervisor of the weekly operations reports department.  He supervised Teamsters Local 856 clerks in that job for approximately three years.  In 1978 there was a formula in Section 3 of Article 25 similar to the formula presently in the collective bargaining agreement, Article 25.  The employees would have their names posted on a list in order of seniority with their approved and eligible vacation schedule for that year.  They were required in order of seniority to select the vacation weeks of the calendar year they were eligible for.  Once one was done, it was passed on.  The selection process was done in the month of March.  The employees were required to select weeks for the calendar year. The formula that was applied set forth how many people got off each week under the formula.  The formula told how many people we were required to have off or could have off

on a particular week during the selection period. While he was in this position he had no employees request that they would like to carry some of their time over into what is called an anniversary year. For those employees who did not select a vacation period, management would select for them or if somebody was off on disability and couldn't take their vacation, even if they were off at the time of selection, we would contact them to be able to post the schedule. In the normal course of business, employees were required to select for the calendar year.

Murphy explained that on an annual basis, typically in February, they put together lists of what each individual employee, by operation, had accrued and were eligible for vacation and they would submit this information to the different operations as the basis for them to put together their vacation schedules. The operations were broken down by preload, sort, package center. The significance of this information was that it established the eligible and accrued vacation weeks which were used by Operations to facilitate putting together the schedules for the calendar year for the vacation selection. Usually this was done in February so that the operation had it in time for March to post their schedules. In later years it was an Excel spreadsheet that was used. Back in the 1980's I don't think we were using Excel at that time so they were manually posted lists.

Murphy advised that if there were carry over vacations from prior years, they would be added into the number of posted weeks less any adjustments that we would make to take away for things like workers' comp and disability where employees weren't entitled to vacation time.

19

There is a section in the contract that allows for an adjustment to be made once. Usually for vacation selection, you have the months of disability and two months thereafter. We cover for the vacation, so if that extended, let's say six months, an additional three and one-half months would be adjusted away from what would be the eligible vacation.

Once this data was provided to the operations, the operations were scheduling vacations on a calendar year basis. Basically the contract says that all vacations are to be taken in the Calendar year they are accrued. The whole point of the exercise was to give the various operations what they needed to produce the vacation schedules.

In January 1993 Murphy returned to NorCal district as controller.

Murphy recalled, "In the 1997 negotiations the formula was slightly changed with respect to the months and then also with respect to the number of weeks, from 26 weeks to 30 weeks and from September to October. The reason why the Company negotiated the change from 26 weeks to 30 weeks was that at 26 weeks the period of time that we could select vacations was somewhat restricted. We were looking to expand that to ease the problem in the centers for having a shorter calculation; it would cause more people to be off so basically to expand that period. It gave us more flexibility in being able to let people off."

Murphy advised that in terms of the number of bargaining unit employees, that you were trying to track for purposes of vacation accrual, there were was roughly 15,000 employees.

Murphy advised that he was aware that the Union is suggesting that employees should be able to take vacation on anniversary-date basis, and that employees should be

entitled to at least carry over some portion of their eligible vacation weeks from the calendar year into a subsequent anniversary year.

Murphy advised that from an accounting standpoint it is not possible to correctly apply the formula in Section 3 if you were to base it on an anniversary year system. He explained that right now the formula is based on the eligibility and accrued vacation that the Accounting Department or the Payroll Department provides to the operators. Depending on what the years of service are, we're able to easily put together how many weeks, by person, with the adjustments so that it's easily added up. If you were to do it on an anniversary year basis, you literally would have to do the calculations individually for 15,000 people. The reason why is that you don't know ahead of time what people are going to select or what they would carry over into a different year an anniversary year. There is no contractual mechanism to establish that figure. Part of the whole process is to provide in February the operator with the materials they need to be able to determine the formula. If you had to wait until after the anniversary year, you couldn't comply with that requirement because what accrued vacation would be taken in the anniversary year is unknown.. If the anniversary date set up were to be followed, there would be no way to know in March how many weeks of a calendar year would be taken if the Union was correct and you could just take some of your accrued leave into the next year the anniversary year. There would be no way to know how many weeks of the total accrued leave would not actually be used in the calendar year but carried over to the anniversary year. There would need to be a calculation for all individual leave for all 15,000 people covered by the process. There is no way accounting wise for such a system to work.

Murphy was asked, "If the Union is correct and you could just take some of your accrued leave into the next anniversary year would you be able to determine how many weeks of the total accrued leave would not actually be used in the Calendar year?" Murphy responded, "No I would not know it ahead of time and the calculation that I would have to do for 15,000 people. Accounting wise there is no way to have such a system to work.

Murphy agreed that the vacation schedule for the months of January through March are taken by an employee through his supervisor on a first-come, first-serve basis wherein he or she would ask for the weeks off in that period.  During that period the taking of vacation is not subject to any master scheduling process.

### POSITION OF THE PARTIES:

### POSITION OF THE UNION:

The dispute focuses on the language found on page 49 of the Northern California Supplemental Agreement, Article 25, Section 4, which reads:

"It's agreed by both parties to this Agreement that employees must take their accrued vacation time each year and that no arrangement to work for this additional compensation during their earned vacation will be allowed except where mutually agreed by the Employer and the Union."

The language in question is the meaning of "each year." There is a dispute between the parties.  The Employer has used the requirement of this section to require each employee to take each year of accrued vacation on a calendar year basis. The Union argues that the provision should be read, to be that, the accrued leave will be taken on an anniversary-year basis beginning on each employee's date of hire.  For example, if you had an employee that was employed, hired on June 1, 2000, under the collective bargaining

agreement, the anniversary date would be crucial for the individual's accrued vacation. At the end of the year, namely June 1, 2001, the worker would have accumulated two weeks of vacation. Under the Union's interpretation, the employee must use that vacation within an anniversary year, namely by June 1, 2002.

The Employer has taken a different approach and has used and applied this language to require employees to take accrued vacation on a calendar year basis. So for the same employee hired on June 1, 2000, by June 1, 2001, the accumulated two weeks of vacation, and according to the Employer, he must take that vacation by the end of that calendar year, or December 1, 2001.

We anticipate that the Employer will present evidence of past practice, and we are prepared to present, from the Union, exhibits (The Union's notices on this subject.)  , that the Union has repeatedly disputed the Past Practice interpretation and application of the Agreement . The Employer has historically at all times backed off of its position with regard to particular individuals. We bring this grievance in the hopes that we can finally resolve this dispute and we request an order from the arbitrator that the term "year" in Article 25, Section 4 of the Northern California Supplemental Agreement and Article 22, Section 25 of the Northern California SORT Rider to the Northern California Supplemental Agreement, refers to anniversary year. This refers to the worker's anniversary year. It is requested that the Employer post that determination on subsequent vacation schedules and apply the language consistent with this interpretation.

The Union's case relies on the plain meaning of the parties' agreement. The union maintains that the term "year" in Article 25, Section 4, refers to the anniversary year. This

23

instruction is consistent with the identical language found in Article 25, Section 1, dealing with the accrual of vacation. It makes no sense to give the identical term differing interpretations. The Employer counters by relying on past practice. The Employer's past practice is flawed. The past practice is persuasive because it indicates intent that a term be interpreted in a particular manner. However, in our case, the Union has been extremely vocal that the Employer's practice is inconsistent with its understanding of the parties' intent. Consequently the Employer's intent to rely on past practice is unavailing. Each "year" in Section 4 of the Agreement refers to years ending with employees' respective hiring dates.

Under the contract employees earn two weeks of paid vacation (ten working days) for every year of work through the first three years of employment. After three years ("years" in this usage years is indisputably based on an employee's respective anniversary date) employees begin earning more than two weeks of vacation per year. The contract is explicit on the meaning of "month" for vacation accrual purposes requiring 13 working days and after a 12 month (a year) employees earn their vacation. Vacation accrues for all but the most senior employees then it is clearly tied to the employee's actual time with the company not to otherwise arbitrary changes in the calendar year. The grievance requests that the same construction of "year" that UPS applies to vacation accrual should also apply to the period in which employees are allowed to extend their vacation. A straightforward interpretation is the most consistent with the parties' intentions and the terms of the contract.

24

The parties meticulously crafted the most complex vacation language you will ever find. The parties did not intend unreasonable or absurd results. UPS' reading of Section 4 leads to both unreasonable and absurd results. An employee hired on November 1, 2009 will accrue two weeks of vacation November 1, 2010. The Employer's reading of Section 4 requires this employee to take his vacation during the calendar year 2010. UPS disallows vacations during December so that this employee is forced to take his vacation during the month of November, a time conveniently for the Employer, with relatively low demand for vacations. Section 3 of Article 25 states, "Vacation periods are not to be arbitrarily assigned to employees during the months of November through March." The assignment of vacation in November, however, is exactly what UPS does too many employees under its faulty reading of Section 4. In addition, Section 3 creates a specific process re vacation selection. Why would the contract be so specific on vacation selection if that process is moot for all employees who are hired late in the calendar year?

UPS' faulty interpretation leads to absurd results. Because UPS has a policy of disallowing vacation time in the month of December, employees hired in December are placed in a Catch-22. They accrue vacation time on their anniversary and by UPS' contract reading, they will have to take it before the end of the calendar year during the month of December, when they are also disallowed from taking vacation. Absurdity arises for employees hired during the last two weeks of November who are technically not allowed to take all of their vacation.

The correct reading of each "year", a reading based on employee respective hiring anniversaries does not result in absurdity; it results in the workable system that the parties

25

intended.  Under the Union's reading of the contract, employees accrue vacation on their anniversary date and must use that vacation within a year of their anniversary date.  This system fits perfectly with the annual March selection period.  If an employee wishes to take vacation between the months of April and November, he must simply reserve it through the selection process.  A correct reading of the contract will not cripple or seriously affect the Employer's business because the Employer will still be able to manage vacation under the March selection process.  The correct contract reading will simply prevent UPS from forcing some employees to take vacation late in the calendar year when demand for vacation is relatively low.

Parallel construction of the word "year" bolsters the Grievant's argument that each "year" is based on employees' hiring dates.  To this point it is ambiguous whether "each year" is based on hiring dates or calendar years.  In Article 25, Section 1:

> Employees with one (1) year of service and less than three (3) years of service with the Employer shall receive two (2) weeks (10 working days) of vacation with pay each year.  Employees with three (3) years of service shall receive three (3) weeks (15 working days) of vacation with pay each year. Any employee who has ten (10) years of service or more, regardless of his/her anniversary date, shall receive four (4) weeks (20 working days) of vacation with pay each year.  Any employee who has twenty (20) years of service or more shall receive five (5) weeks. (25 working days) vacation with pay each year.  Any employee who has twenty five (25) years of service or more shall receive six (6) weeks (30 working days) vacation with pay each year.  Any employee who has thirty (30) years of service or more shall receive seven (7) weeks (35 working days) vacation with pay each year.

It is ambiguous whether each year is based on hiring dates or calendar years.  The next sentence, however, resolves the ambiguity.  In contrast to employees who have less than ten years of service, those with more than ten years receive four weeks of vacation

"regardless of his or her anniversary dates." Thus, only after the ten year mark is vacation assigned regardless of an employee's anniversary date. Prior to that, each year clearly is based on an employee's anniversary date. The fact that each year beginning at the Section 1 is so clearly based on anniversary dates is important for two reasons. First, it confirms the above arguments that, because employees with less than ten years of seniority accrue vacations on their anniversary dates, those employees may be subject to absurd vacation scheduling results. Second, it demonstrates that a parallel construction of "each year" can easily apply to each year in Section 4. Quite logically, employees with less than ten years of experience accrue vacation on a hiring date basis in Section 1 so they should be able to take their vacation on a hiring date basis under the identical contract language of Section 4.

UPS may not rely on a theory of past practice to continue its counter-contractual vacation policy.

UPS argues that its interpretation of the collective bargaining agreement is supported by past practice. In order for past practice to be of any use in interpreting an ambiguous provision, there must be evidence that past practice reflects the parties' mutual understanding. As noted by *Elkouri* and *Elkouri*, "the weight to be accorded past practice as an interpretative guide may vary greatly from case to case." In this regard the degree of mutuality is an important factor. Unilateral interpretations may not bind the other party.

In the Union's case UPS' interpretation of the agreement is unilateral. The Union has loudly and over the years consistently objected to the vacation scheduling policy. See Union Notice Exhibits 1 through 10,prepared and distributed to members, commencing in

27

1999 by Mr. Bookter Chairman of the Union's UPS Negotiating Committee from 1979 to 2007. In those Exhibits the Union has colorfully and vocally stated its objection to the Employer's interpretation. From memos dating back to 1999 through the date of the grievance in this matter and beyond; the Union has never agreed to the Employer's interpretation of Article 25, Section 4. Consequently, there is no mutuality and past practice which provides guidance in this case.

The Employer has not formally informed the Union of its intent to read the contract in this way. It has unilaterally interpreted the contract language at issue here.

## POSITION OF THE EMPLOYER:

For at least the last 25 years, employees covered by the Northern California Supplemental Agreement have been required to schedule all accrued vacation which they are eligible to take, within the calendar year.

As far back as the 1980's, each operation covered by this Agreement received a schedule showing the number of weeks each employee in an operation had accrued and the amount of weeks which they were eligible to take in that calendar year, including a total for that operation. (A formula was negotiated by the Parties found in Article 25 section 3 The fourth paragraph in the section) From this number any weeks taken prior to the end of March were subtracted out of the total and that number was divided by a figure corresponding to the number of weeks in the contractual vacation period to arrive at a number representing a number of drivers who must be allowed off in any given week during the vacation period. This process was critical to the operation, because the operation then had to plan with that number in mind for staffing purposes. In each of these

operations, employees were required to schedule their vacation within that calendar year in which they were eligible to take it.  Testimony in this regard came from persons who were required to do this when they were bargaining unit members and from managers who oversaw the process in all three of the UPS districts covered by the collective bargaining agreement.

Frank Cademarti testified that he managed several operations represented by Local 2785 including the feeder operation in 1993 – 2000 and that the vacation process was exactly the same as in other jurisdictions where he was involved in the process.  Former UPS comptroller Rich Murphy testified that in his various assignments in the accounting departments the process for scheduling vacations throughout all of the operations covered by this contract and the process for determining the formula to determine the number of employees per week to be off in any operation remained the same.  That process included the requirement that each employee take all of their accrued vacation in the calendar year in which they were eligible to take it, as the contract stated.  Further, there is also unrebutted testimony that UPS payroll specialist, supervisors and managers, and labor supervisors and managers, monitored the process each year to ensure that employees were selecting all of their accrued vacation per the contractual scheduling during the same calendar year.

There were occasions where employees simply could not accomplish the scheduling of all their accrued vacation in the same calendar year, particularly in the first year of eligibility.  An example of this would be an employee who was hired in late November of any given year.  His or her first eligibility would not be until the following November and

29

by then the vacation period would have ended.  In those cases, because California law does not allow for a forfeiture of vacation, and the contract does not allow a buyout of vacation leave, employees would carry over the amount into the next year and then would be required to schedule those weeks in the following year.  In other words on an exception basis the system accommodated those situations.

### THE EMPLOYER'S POSITION RE THE CONTRACTUAL LANGUAGE:

The basic contractual language in Article 25 of the Supplemental Agreement addresses the subject of vacations and vacation scheduling and has remained essentially unchanged for decades.  As set forth in Section 1, employees must have "one year of service" to be eligible to take vacation.  On the first anniversary date, the employee is entitled to two weeks of vacation.  After three years, and then again after ten years of service, the amount of vacation entitlement increases.  The contract also states that after ten years of service, the employee receives that vacation pay "each year" "regardless of his or her anniversary date."

The same section recognizes the importance of the vacation selection process to the Employer with respect to planning its operations.  It states as a matter of policy that "due consideration" be given to UPS' needs so that the business will not be seriously affected by having too many persons seeking vacations at the same time."  This is a fundamental principle behind the entire selection process which is set out in Section 3.

In Section 3, the parties agreed that on the basis of seniority vacation periods would be selected for the period from April through October.  Most importantly the selection outlines a formula which determines the number of employees an operator may allow to be

off in any given week during the vacation period. Currently, that formula requires that the Employer determine the total amount of accrued vacation weeks for all employees in each operation that they would have accrued and been eligible to take during that period. After that number is determined the process requires that the Employer then subtract from that figure the total number of those accrued and eligible weeks that had already been taken by those employees during the earlier months of January through March. That figure is divided by 30 weeks which corresponds to the number of weeks from April through October. It is this formula and the application of this formula using all accrued and eligible vacation available for the employees that requires: 1) the Employer to make available all weeks of accrued vacation to be taken during the vacation period in the calendar year and 2) gives the Employer the degree of certainty as to how many employees are allowed to be off in any given week under the formula in that calendar year.

The whole premise of the formula is that all employees will take all their vacation in the calendar year, and therefore, the Employer has to allow a sufficient number of employees off each week to achieve that objective.

The Union claim that there is no relationship between the vacation selection period and the amount of weeks during the same period, and that this number was chosen out of thin air without relation to anything else makes no sense and must be rejected. That premise is then confirmed in Section 4 which states, "The parties agree that employees must take their accrued vacations each year."

The Union candidly admits that the purpose of this arbitration is to have the arbitrator amend the wording of this section to add the word "anniversary" into the

31

contract before the word "year" so that the contract would read instead that the employee had to take all accrued vacation in their anniversary year.   Such a construction is inconsistent with the overall framework of Article 25.  The final proof of that is found in the language of Article 25, Section 7, which sets forth the process for selecting vacation.  There is no dispute that the "selection list" referred to in that section is a spreadsheet that contains all of the months in the calendar year, with the names of the employees in the operation, together with all of the accrued vacation weeks that an employee is eligible to take in that same calendar year.   Section 7 provides that, "using this selection list, employees shall by seniority select vacation under a schedule that has 25% of the operations select each week for four weeks."  It then says that "if an employee does not do this in the correct week, they lose their choice of vacation "and must take what is left."

This language means what it says.  If the employee does not sign up for his or her vacation to be taken in the calendar year contained on the vacation list, the employee must take what is left on the spreadsheet for the calendar year.  It is not an option.  It is a "must." The interpretation advanced by the Union would have the arbitrator believe that under Article 25 an employee has the option of taking "what is left", or if they decided they do not want to take what is left, the option of carrying accrued vacation over to the anniversary year.  This is not what the section says, and if the Union's view was adopted it would make this language superfluous.

## THE UNION'S GRIEVANCE IS NOT SUPPORTED

## BY THE CONTRACTUAL LANAGUGE:

32

The Union bears the burden of proof in this matter. Here, the contractual interpretation urged by the Union is contrary to the contract language itself and it is inconsistent with the manner in which vacation scheduling has been done under this agreement for decades. In addition the interpretation sought by the Union would deny the Employer a critical tool in managing its business and would deny the Employer the benefits of its bargain with the Union, which has resulted in significant benefits to employees in the selection of vacation leave. Under the Union's interpretation important contractual terms would be rendered meaningless, a result obviously not contemplated by these parties when these terms were written. The Union argues that because vacation leave is earned on an anniversary year basis, the Employee has the right to schedule and take vacation on an anniversary year basis. The Union asks that the arbitrator amend the agreement to state in Section 4 that employees must take their accrued vacations each "anniversary" year, rather than what it says, that employees must take their vacation "each year."

Words have common usage unless modified by other terms. In common usage, the word "year" means just what it means in the dictionary, a period beginning in January and ending in December. When the word is intended to mean another time period, it is usually accompanied by a modifier, such as "fiscal" year or "anniversary" year.

The Employer points to a contract between UPS and Joint Council of Teamsters 28, wherein that agreement the parties agreed the employees must work one year (an anniversary year) before they are eligible for vacation leave. However, that agreement

33

provides that each employee must celebrate their anniversary each year, must take their earned vacation in the following anniversary year. The agreement then allowed for this because there was no scheduling formula as in the agreement here; rather, the contract merely required a minimum of 10% to be off each week in each center for the period from January through November, and the number was unrelated to the number of accrued weeks to be taken in the calendar year. The parties expressly stated that the ability to take vacation extended to the anniversary year, because that is not the normal and usual usage of the term. It is clear that this term "year" in Section 4 has its ordinary usage, a calendar year. If the Union is to carry its burden of proof, it must do more than simply claim that something other than a normal usage of the word "year" was intended. The Employer cites *Gulf Printing*, 92 LA 893, arbitrator King, 1989, where he holds that: "If one of the parties is contending for a construction other than that which would be given based upon the application of the ordinary meaning of the words used, the burden then must fall upon the party contending for such a construction to establish that special circumstances exist warranting that particular construction."

In the overall context of Article 25, the meaning of the term "year" in Section 4 clearly refers to the calendar year. There are several complicated and inner related aspects of the vacation language. First, the contract establishes that during those months where employees most want to take vacations (the vacation period from April through October), the weeks of leave will be selected by seniority with a certain percentage to select each week until all of the accrued eligible weeks were selected. In order to ensure that all employees would be allowed to take their accrued vacation during this period, if eligible to

do so, the parties had to have a formula which would add up all the eligible weeks and divide that total by the total weeks in the vacation period. When the vacation period was from April through September, the total weeks as the divider were the same as the vacation period, 26 weeks. When the vacation period was extended one month through October, the vacation period was extended a similar period, four weeks more, for a total of 30 weeks. It's just that simple, and it is entirely premised on the requirement that all employees must take their accrued and eligible vacation each year, unless they are prevented from doing so because of their hire date or other circumstances such as being on workers compensation.

The Employer provided a calculation of the formula using a work group with 300 weeks of accrued vacation that they were eligible to take in the calendar year and 50 weeks taken in the period encompassing the first three months of the year, which weeks are subtracted from the total 300 weeks, to leave 250 weeks which are then divided by 30 weeks, the devisor representing the period from the 30 weeks in the vacation period to come up with 8.03 employees which are rounded up to nine employees off each week to accomplish the taking of all vacation in the calendar year. The Employer cannot deviate from the formula. If the employees could deviate from the requirement to take vacation in the calendar year and carry over varying and unknown amounts into the anniversary year, then the critical figure in the above example, 250 weeks, becomes illusory and the resulting figure, the number of employees the Employer is required to allow in any given week, becomes illusory. If, for example, 50 more of the 250 weeks could be carried over by the employees into an anniversary year, this is unknown when the selection process takes place. If it occurred, the formula would have worked an injustice to the Employer. In that

35

case, the correct formula would have been 200 divided by 30, equaling 6.06, rounded up to seven employees off each week. This would make a difference of two employees more for each of the 30 weeks of the vacation period. That is a significant difference, and becomes even more of a disparity if a greater percentage of the weeks could be and then were carried over into the anniversary year. The Union's statement that, "and so, what scares them is that if everybody did that, then instead of having 300 weeks of vacation, for instances, such as feeder, they would have 600 weeks divided by 30, which would mean you would have . . . it would be 20-odd people."

        This is the Company's concern. The contract states as a matter of agreement that the section is intended to ensure that there will not be too many people off on vacation at the same time. This is a legitimate concern. By its own admission, the Union's interpretation would deprive the Employer of that aspect of the agreement that allows for it to plan for vacations in its operations. This is clearly not what was intended by these parties when the language was negotiated.

        The Employer's practice represents the current interpretation of the contractual language which is found in Section 7. The section permits the Employer to assign to employees the weeks that are left on the vacation schedule if they do not select all their vacations during the week that they are eligible to do so. It says these employees "must" take what is left. That language should end this debate. "Must" is not equivocal. If the Union's interpretation is what was intended, then employees would have no obligation to select vacation for that calendar year, but could carry any or all of it into the next year and the next vacation period. If that were the case, then the parties would have no reason or

basis to state unequivocally that an employee "must take what is left" on the vacation list, which contains only the weeks in the calendar year.  The Union's interpretation would simply eliminate this language, this requirement and this Employer right from the contract. It is a fundamental principle of contract interpretation that words have meaning, and that an interpretation that would tend to nullify or render "meaningless" any part of the agreement is disfavored because of the general presumption that the parties do not carefully write into an agreement words intended to have no effect. *Gulf Printing, supra.*

### THE PAST PRACTICES OF THE PARTIES CONFIRM THAT UPS' CONTRACTUAL INTERPRETATION REPRESENTS THE INTENT OF THE PARTIES:

Even if the contract language is ambiguous, the evidence establishes that for the past several decades the parties have implemented the vacation language in the same manner in each of its many operations covered by this agreement.  1) as to every operation, it is undisputed that the practices of the parties for decades was to require employees to schedule all of their accrued leave in the calendar year; 2) in those many operations covering the geographical expanse of this contract there were no grievances filed by any of the local unions covered by this contract over this issue, and none of those locals except 2785 ever claimed that the contract was not being applied correctly; 3) Local 2785 never filed any grievances or registered any formal complaints until October 2009.  There is no evidence prior to this grievance of any direct communications between the Local and the Employer in which the Union took issue with the Employer's practices or argued that the practices represented an incorrect interpretation of the agreement.   The only communications with the Employer were letters that requested information as to

"ascertain that the agreement is being adhered to." In fact, in the letter sent by the Union to UPS in March 2000 it is apparent that the local did from time to time post notices to employees concerning the vacation procedures.

UPS believes that the intent of the contract is clear from the overall language of Article 25. "Employees must take and take all of their eligible and accrued vacation each year" as Section 4 states. This means the calendar year. However, even if the arbitrator here concludes that the language of Section 4 is ambiguous as to the meaning of the term "each year" any such ambiguity can be resolved by looking to the past practices of the parties to this agreement. Here, the practice for decades has been consistent with the interpretation articulated by UPS, and there is no evidence of any contrary practice.

In addition, there have been several different contract negotiations since this language was first adopted. If Local 2785 believed that UPS was applying the language erroneously, contrary to the intention of the parties, there were multiple opportunities to address the situation, particularly in 1997, when the formula for scheduling vacations was amended. At that time the business agent for Local 2785 was the Union chairman in those negotiations and later ones as well. Yet, the subject of calendar year versus anniversary year was never brought up and discussed by the bargaining parties, according to Mr. Bookter's own admission,

Under these circumstances, the past practices of the parties establish the intent of the parties with respect to any ambiguity that may exist.

> The Employer cited UPS and Teamsters Local 261, an arbitration by Myron
> Joseph in 1980. The arbitrator stated" "It is not the function of the arbitrator
> to change the contractual relationship between the parties in the context of a

grievance.  The parties have lived with an arrangement for at least 15 years. If the parties wish to change that arrangement that should be a matter of negotiations and not a matter of an arbitrator's decision.  If there is to be a change in the nature of the contractual relationship, it must come from the parties as a result of mutual agreement.  Until that event occurs, the parties must live with what they have lived with in the past. "

In the present case, the past practice that has controlled the vacation practices is unrebutted.  The Union did not protest this practice to the Employer in any meaningful way, but rather from time to time advanced its interpretation in announcements to employees that went unheeded.  Other local unions did not protest or question the application of the language over decades in any fashion whatsoever.   Under these circumstances, the practices followed by the parties over many years do indeed manifest a mutual understanding of the parties to this contract as to the meaning of Article 25.

<u>**THE UNION'S ARGUMENTS UNRELATED TO THE
CONTRACTUAL LANGUAGE ARE WITHOUT MERIT AS WELL:**</u>

The Unions seems to argue that it must follow as night follows day that if an employee earns vacation on an anniversary year basis, that employee must be entitled to take that vacation as they wish on an anniversary year basis.  The way in which the vacation is accrued, and the manner in which it must be used, is a creature of contract and the practices that flow from that contract.  There is no template for these agreements, and agreements which require employees to use all available vacation leave in the calendar year are not unheard of, or at all unusual.

Testimony in this case establishes that the reason why parties instituted this requirement, relates to the stated contractual principle that the Employer must be able to conduct its business without a concern that too many employees will be off in any given

year.  The need to have all vacation taken in the calendar year relates directly to the contractual mandate that employees be allowed to take their vacation in the vacation year and that corollary requirement that in order for this process to work they must take their vacation in that calendar year.  The Company's former comptroller testified without any contradiction, that given the number of employees involved in the process, it would not be possible under the current contractual language to schedule vacations in the manner advocated by this one local union because for the same data to be computed on an anniversary year basis, there would have to be individual calculations for each of the several thousands of employees.  He further testified that given the timing of the process, the data would be unavailable when schedules were posted and there is no contractual mechanism to implement such a process in any event.

The Union's proposed remedy would undermine the contract and result in chaos. There is no logical basis for this position.

The Union opines that requiring employees to take all their accrued vacation each calendar year results in a disparity between employees as to their range of options in scheduling vacations, pointing out that an employee hired early in the year would in their first year have a greater time frame to schedule vacations than employees hired mid-year or later.  While it is correct that in the first year an employee hired in mid-August would have to schedule his or her vacation for weeks after mid-August that first year, this can hardly be termed a hardship.  In the next year by the time the vacation schedule is posted the employee will have earned an additional one week of vacation that can be taken any time during the vacation period, and then another week could be taken after mid-August.

In any event, the parties have chosen this process for all the reasons stated.  The fact that one hire date has some effect on vacation scheduling, and may result in some employees having greater flexibility than others, is not a basis for a grievance, and does not justify attempting to change the contractual procedures through the grievance procedure. Arbitrator Joseph in *Teamsters Local 261, supra,* points out that the use of a date of hire for vacation calculations would equalize the treatment of employees hired before and after July 1973.  But, the parties did not write equal treatment for both groups into the collective bargaining agreement.  Instead, they agreed that the first day of probation would be the seniority date for new employees hired after July 1973.  In the context of this bargaining history, it cannot be held that the Union's interpretation is more logical or that it would reflect the intent of the parties.

In fact, the parties have already addressed this issue as it should be addressed – in collective bargaining.  As a product of negotiations, the parties agreed that once an employee has ten years of seniority, the vacation entitlement begins on January 1, "regardless of his or her seniority date."  Thus any disparity becomes moot at this point.  In fact, the existence of this language further undermines the logic of the Union's position.

The Union suggests that the arbitrator should consider ignoring the undisputed evidence of past practice involving all of the other Union locals and all of the other jurisdictions covered by this agreement and find that because this local from time to time took issue with these procedures but did not pursue any grievance remedy, the arbitrator should consider a remedy that is applicable only to this local.  This position ignores the basic import of evidence of past practice.  In a case where the language of the contract is

41

deemed by the arbitrator to be ambiguous, such evidence provides important evidence of the mutual intentions of the parties as to the meaning and application of that language. Here, the evidence that all of the local unions except Local 2785 have accepted the practices which required employees to take all of their accrued vacation in the calendar year, and have never registered any protest of these practices, is powerful evidence that this is exactly what was intended by the parties regardless of what an individual business agent for Local 2785 believes it should be.

In any event, there is no contractual basis for creating an exception for employees of Local 2785 that does not apply to all employees. The contract states that despite the fact that there are several unions covered by this agreement, there is a single bargaining unit (Joint Exhibit 1, National Master Agreement, Article 2, Section 1). Local 2785 does not have a separate bargaining unit and cannot single itself out for contractual construction that would be inapplicable to the other locals. As stated earlier, there is a reason that Local 2785 is isolated in this grievance. It has articulated a position out of touch with contractual language and out of touch with the way these parties have operated for decades. It cannot salvage that dilemma by trying to distance themselves from the other locals covered by this Agreement.

This unassailable logic is further supported by the language of Article 17, Section 1 of the Northern California Supplemental Agreement, which states that UPS cannot enter into an agreement with employees, singularly or collectively, that in any way conflicts with the terms of the contract. Thus, even if from time to time UPS allowed employees to

schedule vacations in a manner contrary to the language of the contract, such arrangements are invalid and are by contract "null and void."

## DECISION

This is a contract interpretation dispute involving the vacation scheduling procedures as forth in Article 25 of the Collective Bargaining Agreement. It is the Union's position that the phrase in Section 4 of Article 25: "Employees must take their accrued vacation each year"; refers to employees taking their accrued vacation in their anniversary year. The Union points to Article 25 Section 1 where it contends that "each year" is an ambiguous phrase that is resolved by the next sentence. "Any employee, who has ten (10) years of service or more, regardless of his or her anniversary date, shall receive four (4) weeks (20 working days) of vacation with pay each year. Thus only after the ten year mark is vacation assigned regardless of an employee's anniversary date. Prior to that year clearly is based on an employee's anniversary date.

It is apparent to me that this Section deals with the procedure for accruing vacation based upon an anniversary date, but it does not deal with the period of time at which that accrued vacation maybe taken. It is clear that the word "year" is ambiguous as from Section 1 and Section 4. Section 4 deals with when the accrued vacation shall be taken. "It is agreed by both parties to this Agreement that employees must take their accrued vacation each year and that no arrangement to work for additional compensation during their earned vacation will be allowed except where mutually agreed upon by the Employer

43

and the Union.  This Section deals with when the accrued vacation may be taken.  The meaning of the word "year" has changed in Section 4 from the meaning of word "year" in Section 1.  The clear meaning of the word year is the dictionary meaning, a period of 365 days divided into 12 months and regarded in the Gregorian Calendar as January 1 and ending the following December 31.  The "year" as used in Section 4 if it were to reflect anniversary date would need to be modified by the word anniversary, the date on which some event occurred in an earlier year.  This definition and modification clearly meets the purpose of the use of year in Section 1.  If the negotiators had intended to use anniversary date in Section 4 they would have needed to modify the term year with anniversary year.  Over the course of the more than thirty (30) years, that this procedure set out in Article 25 has been in use it is admitted that there has been no attempt by the Union to so modify Section 4 with the addition of the word "anniversary".  The notices drafted by Secretary Treasurer/Chief Negotiator Bookter have never been presented to the Employer in negotiations as a proposal from the Union in order to change the accepted meaning of the word year in the context of Section 4 to modify it to "Anniversary" year.

It is clear that the Employer over the course of the thirty (30) years in which vacation schedules have been prepared under the formula set forth in the fourth paragraph found in Section 3 of Article 25 the parties have followed this formula and these procedures using "year" as found in it's dictionary definition, that is a calendar year in the formula.  There is no requirement in contract interpretation that because a word has meaning in one context that it must retain that meaning in a subsequent context where it is used to describe a different meaning in a different context.

44

Clearly this is an issue that should not be dealt with by an arbitrator changing thirty (30) years of process with respect to scheduling of employees in an industry that is so time and manpower dependent as the package delivery industry has become. There has been no effort in negotiations, made by the Union to change the meaning of the word "year" to add "anniversary" as a modifier.

Based on the forgoing, it is concluded that the Employer has not violated the Agreement and the Union has failed to establish a basis that the Employer has misinterpreted Article 25 of the contract.   The Grievance is denied.

*William E Engler*

William E. Engler

*September 7, 2010*

45



# NOR-CAL GRIEVANCE PANEL
## DECISION FORM

A-M



LOCAL #278   vs.   UPS

DATE 01-04-2010

PAGE #1
CASE NUMBER          UPR 12-09-14zz

TAPE A-1

**Brief Statement of Facts:** UPR 12-09-14zz          Local 278 vs. UPS - Art. 16 NMUPSA, Art.25 Sec.1-9
NCSR Art. 22 NCSA – UPS mgmt cannot conceive of the fact that vac.days, under the terms of the
NCSR/NCSA are earned on a monthly basis starting w/1st month an emp.wks 13 days in [see para #8 in
Sec.1]. Therefore ea.emp.has a "personal" vac.year. Basically the same concept used to underpay PT emps.
you know "personal rates of pay". They have no problem understanding that concept. The problem is this: An
emp.hired in Jan.has to, in theory, wk one year to earn a vac.and aft.completion of that year has another 11
mos.in which to take that earned vac. On the other hand an emp.hired in July according to the company think
tank only has 6 mos.in which to take their vac. This is what brings us here today. We are asking that this pane
to please rule to put a stop to the lies and the liars who tell them. Emps.are threatened w/having their
vacs.assigned if they fail to select them in accordance w/the "made up" rules that someone has decided all
vac.must be used in the current calendar year. We understand that some of these decision makers have put
in many, many years wkg for UPS and it is perfectly understandable that their mental capacity is not
necessarily what it used to be. So far they have not been able to grasp the fact that square pegs do not fit in
the round holes. When vac.is earned on a snrty date basis it can only be used on the same basis or certain
emps.will not be treated equally.

**Relief Being Sought:**          We are asking this panel to rule in the Union's favor and if no agreement can be
reached here that this case be deadlocked and referred to arbitration immed.to prevent any further injustice
from being forced upon our members.

|  |  |  |  |  |
|---|---|---|---|---|
| Union Panel: | Frates |  |  |  |
| Company Panel: | Hoy | Sweeney | Ferrigno | Coppa |
| Union Rep: | Bookter | Gasti | Lawson | Piña |
| Company Rep: | Mullan | Lynch | Cilia |  |
|  |  | Cademarti | Fernandez |  |

**During executive session, a motion was made and seconded;**
Based on the facts presented in this case, the claim of the Union be allowed.

**The Motion Deadlocked referred to ARBITRATION.**

ARBITRATORS CHOSEN: 1. ENGLER          2. ANGELO          3. ASKINS

Respectfully Submitted,

*Peter Núñez*

Peter Núñez
Union Secretary/ JC3B

LOCATION CODE: San Bruno/San Francisco/Menlo Park

UNITED PARCEL SERVICE – GRIEVANCE FORM

CERTIFIED# 7009-0820-0001-6475-5927

Frank Cademarti, Labor Manager
North California District
2222 17th Street
San Francisco, CA103

Marty Frates, Union Chairman
Teamster – UPS Labor management Committee
C/O Teamsters Local #70
P.O. Box 2270
Oakland, CA 94621-0170

Recording Secretary
Teamsters Joint Council No. 38
1225 Thirteenth Street
Modesto, CA 95354

DATE OF FILING: October 29, 2009

NAME OF EMPLOYER OR UNION REPRESENTATIVE CONTACTED PURSUANT TO ARTICLE 7:

FRANK CADEMARTI, NORTH CALIFORNIA DISTRIC LABOR MANAGER

DATE REPRESENTATIVE CONTACTED: October 29, 2009

ALLEGED VIOLATION ARTICLE AND SECTION:     ARTICLE __25____ SECTION _1 THRU 9__

BREIF STATEMENT OF FACTS: UPS management can not conceive of the fact that vacation days, under the terms of the Northern California Supplement/Sort Rider Agreements, are earned on a monthly basis starting with the first month an employee works thirteen (13) days in. (see para #8 in Section 1) Therefore each employee has a "personal" vacation year. Basically the same concept used to underpay part time employees, you know "personal rates of pay". They have no problem understanding that concept! The problem is this. An employee hired in January has to, in theory, work one (1) year to earn a vacation and after the completion of that year has another elenen months in which to take that earned vacation. On the other hand an employee hired in July, according to the company think tank, only has six (6) months in which to take their vacation. This is what brings us here today. We are asking that this panel to please rule to put a stop to the lies and the liars who tell them. Employees are threatened with having their vacations assigned if they fail to select them in accordance with the "made up" rules that someone has decided all vacation must be used in the current CALENDAR YEAR. We understand that some of these decision makers have put in many, many years working for UPS and it is perfectly understandable that their mental capacity is not , necessarily , what it used to be. So far they have not been able to grasp the fact that square pegs do not fit in the round holes. When vacation is earned on a seniority date basis it can only be used on the same basis or certain employees will not be treated equally.

RELIEF BEING SOUGHT: We are asking this panel to rule in the Unions favor and if no agreement can be reached here that this case be deadlocked and referred to arbitration immediately to prevent any further injustice from being forced upon our members.

Retail delivery drivers union local #278
5 Thomas Mellon Circle, Suite 130
San Francisco, California 94134

---

Jack Bookter, Secretary- Treasurer

---

THE ITEMS LISTED HEREIN SHALL NOT PRECLUDE EITHER PARTY FROM AMENDIND THE FILING AT THE TIME OF THE HEARING: